**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3084-22

BERNADETTE STAVROS,

    Plaintiff-Respondent,

v.

THOMAS STAVROS,

    Defendant-Appellant.

_____

> Argued January 27, 2025 – Decided February 20, 2025
>
> Before Judges Berdote Byrne, Jacobs, and Jablonski.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-1507-09.
>
> Amy D. Cox argued the cause for appellant (Rovner, Allen, Rovner, Zimmerman and Lukomski, attorneys; Amy D. Cox, on the brief).
>
> D. Ryan Nussey argued the cause for respondent (Klineburger and Nussey, attorneys; D. Ryan Nussey and Lisa G. Nolan, on the brief).

PER CURIAM

Defendant Thomas Stavros appeals from the trial court's final judgment, granting plaintiff Bernadette Stavros's motion to enforce litigant's rights; finding defendant breached the parties' Property Settlement Agreement ("PSA"); ordering defendant to pay plaintiff $91,250; and denying without prejudice plaintiff's additional requests for relief.

At issue in this case is the parties' agreed-upon equitable distribution of an interest in Olga's Diner ("Diner"), a property owned and operated by Stavros, Inc.—a family-owned business in which defendant held twenty-five percent ownership interest. The parties signed a PSA on April 10, 2009, which represented the Diner was listed for sale and plaintiff would receive half of defendant's share of the expected sale proceeds. Although the PSA represented the Diner was listed for $5.8 million, the property was not listed for sale and never sold. Instead, a portion of the property was acquired by the State through eminent domain, a part of the property leased by the Diner was condemned by the State, and the Diner was foreclosed upon. Defendant did not share any of the proceeds he received from the eminent domain action or the inverse condemnation settlement award with plaintiff, and, when she learned about those actions, she filed a motion to enforce their PSA. After a plenary hearing, the trial court granted plaintiff's motion and found it equitable to order defendant

2

to pay plaintiff half of any proceeds defendant received from the inverse condemnation action.

Based upon our review of the record and applicable law, we are satisfied the evidence in the record supports the trial court's decision that the parties intended to share defendant's interest in the Diner equally, and awarding half of the proceeds from the inverse condemnation action to ensure an equitable and just result. Accordingly, we affirm.

I.

After twenty years of marriage, the parties signed a PSA in anticipation of their divorce, where they agreed the Diner was marital property subject to equitable distribution. Specifically, the PSA states:

> 25. . . . The parties acknowledge that they own no residential property. However, [defendant] holds a twenty-five percent . . . interest in Olga's Diner and the land it is located on, at the intersection of Route 70 and Route 73, Marlton, New Jersey. Olga's Diner and the land is currently listed for sale at the price of $5.8 [m]illion . . . . Upon the sale of Olga's Diner, the proceeds from the sale will be utilized to pay down the parties['] credit card debt and will thereafter be split equally between [defendant] and [plaintiff].
>
> . . . .
>
> 32. . . . It is acknowledge [sic] that [defendant] hold[s] a twenty-five percent . . . interest in Stavros, Inc., a closely held New Jersey [c]orporation, which

3

owns Olga's Diner. Presently, Olga's Diner is listed for sale for $5.8 [m]illion . . . . Upon sale of said diner, [defendant] agrees to provide [plaintiff] with fifty percent . . . of the proceeds of sale. Before the proceeds are split equally between [defendant] and [plaintiff], all credit card debt to be paid down.

No other marital property was equitably distributed. Although at the time of the signing of the PSA, plaintiff had secured employment as a bus aide, and defendant claimed to be unemployed, plaintiff had been a homemaker during the marriage and defendant worked in his family's business. In the PSA, plaintiff waived her right to have income imputed to defendant for the purpose of establishing his alimony obligation in consideration of her equal share in the proceeds from the disposition of the Diner. Additionally, the parties acknowledged in their agreement that plaintiff was represented by independent counsel and defendant had voluntarily waived his right to counsel.

Unbeknownst to plaintiff, who had no involvement in defendant's family business, at the time of the execution of the PSA, the Diner was already the subject of a condemnation judgment, a fact known to defendant, who had been negotiating with the Department of Transportation ("DOT") for at least a year. The DOT had filed a complaint to condemn portions of Stavros, Inc.'s property on June 12, 2008. On September 19, 2008, the trial court had entered a final judgment allowing the DOT to exercise eminent domain and ordering just

4

compensation to be paid to Stavros, Inc. for the DOT's taking of its property. Defendant testified at the plenary hearing he was aware of the eminent domain judgment at the time he signed the PSA.

In its May 3, 2023 oral decision, the Family Part found plaintiff and defendant "understood what they signed. They signed an agreement where the defendant promised to pay the plaintiff half of the proceeds . . . of the diner." The trial court added, "the parties intended to settle a divorce litigation. And it included giving plaintiff some financial consideration. She did not work. He did. She did not receive alimony in the PSA or anything else in the form of support or equitable distribution, other than an automobile." The court found plaintiff's testimony that "she expected to receive the money from the sale of the business" credible. In addition, the trial court found "the PSA expressly state[d] in two places that [plaintiff's] consideration for entering into the agreement is money from the business's sale."

Although the PSA included the Diner's specific listing price of $5.8 million, employed the word "sale," and plaintiff testified credibly that defendant had told her that amount, defendant insisted at the plenary hearing "it was never going to sell" and he "never came up with the [$]5.8 million" price that was included in the PSA. Defendant testified he "shrugged [his] shoulders" when he

saw that amount listed in the PSA and "[said] if that's what was written down that's what written [sic] down. It's meaningless because it never" sold. Defendant did not present any evidence at the plenary hearing to demonstrate the property was ever listed for sale.

The trial court found there was "no credible evidence that the property was listed for private sale at the time the PSA was entered into." It stated, "[a]t the time the agreement was executed the DOT had already a final judgment to obtain the property through eminent domain . . . . Defendant was well-aware of this as he was involved in the litigation on behalf of Stavros, [Inc.]. He knew the property was being taken by the [DOT]."

Evidence in the record demonstrates that from 1980 through 2009, Stavros, Inc. owned the Diner and the land it was located on; it also leased land from the State that provided ingress and egress to the back of the Diner from an adjoining highway. After the DOT began a construction project on the highways that bordered the Diner, it permanently condemned portions of Stavros, Inc.'s owned land and temporarily condemned portions of its leased land. The Diner closed in 2008 for reasons unrelated to the eminent domain action, and in 2014, was the subject of foreclosure.

A-3084-22

On May 30, 2014, Stavros, Inc. was awarded $998,400 in its condemnation action as compensation for the DOT's permanent taking of its property. At the plenary hearing, defendant testified, without supporting documentation, that he did not receive any distribution from his twenty-five percent share of this award because it was used to pay Stavros, Inc.'s attorney's fees and his debt to an aunt who had loaned him money.

In March 2013, Stavros, Inc. filed an inverse condemnation claim relating to its right to reasonable alternative access to its leased and owned land. On November 5, 2020, Stavros, Inc. and the DOT entered into a settlement agreement for $1.2 million. At this time, Stavros, Inc. was allegedly defunct, and after paying attorneys' fees and company debts, defendant alleged his twenty-five percent distribution was $182,250 from the settlement award. He did not share any of the proceeds with plaintiff. In July 2021, plaintiff learned about defendant's receipt of settlement proceeds from a third party and subsequently filed the motion to enforce the parties' PSA.

## II.

We defer to the family Part's findings of fact "when supported by adequate, substantial, credible evidence" in the record. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998); accord Gnall v. Gnall, 222 N.J. 414, 428 (2015). We

7

"accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 413); see also Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016). Further, discretionary decisions of the family court are afforded "great deference." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012).

Nevertheless, as with any contract, our review of a settlement agreement is de novo because the interpretation of a contract involves legal questions. Quinn v. Quinn, 225 N.J. 34, 45 (2016) ("An agreement that resolves a matrimonial dispute is no less a contract than an agreement to resolve a business dispute."). Although contracts between spouses are subject to the same legal principles that govern contracts between strangers, see id. at 45-46, "'[t]he law grants particular leniency to agreements made in the domestic arena,' thus allowing 'judges greater discretion when interpreting such agreements,'" Steele v. Steele, 467 N.J. Super. 414 (App. Div. 2021) (quoting Guglielmo v. Guglielmo, 253 N.J. Super. 531, 542 (App. Div. 1992)).

"There is no dispute that courts possess the equitable authority to modify privately negotiated [PSAs]." Addesa v. Addesa, 392 N.J. Super. 58, 66 (App. Div. 2007). "[S]uch agreements 'must reflect the strong public and statutory

purpose of ensuring fairness and equity in the dissolution of marriages.'" Ibid. (quoting Miller v. Miller, 160 N.J. 408, 419 (1999)). PSAs may be reformed "when, through a common mistake, or mistake of one party accompanied by concealment of the other, the agreement fails to express the real intent of the parties." Miller, 160 N.J. at 419; see also Addesa, 392 N.J. Super. at 75 ("[A]ny privately negotiated PSA[] may be reformed where there is unconscionability, fraud, or mistake and concealment.").

The PSA's plain language makes clear defendant agreed his share of the Diner was a marital asset subject to equitable distribution. See Rothman v. Rothman, 65 N.J. 219, 228-29 (1974), See also D.M.C. v. K.H.G., 471 N.J. Super. 10, 30-31 (App. Div. 2022); Slutsky v. Slutsky, 451 N.J. Super. 332, 355-56 (App. Div. 2017); Elrom v. Elrom, 439 N.J. Super. 424, 444-45(App. Div. 2015). He also voluntarily agreed to share that marital asset equally with plaintiff in exchange for her waiver of alimony or any other support or distribution. Although at the plenary hearing he testified the Diner had never been listed for $5.8 million and that number had no basis in reality, defendant knew that number was relied upon by plaintiff when she signed the agreement and when she waived alimony or any other form of distribution.

On appeal, defendant argues plaintiff was entitled only to the proceeds resulting from a "sale" of the Diner, and not any other distribution made to him as a result of his interest in the Diner. However, that narrow reading is belied by the parties' intentions as set forth in the record. In their PSA, the parties agreed to share defendant's twenty-five percent interest in the Diner equally. It is of no moment that defendant's distribution was the result of an award after litigation and not a "sale," particularly since defendant misrepresented to plaintiff that the Diner was listed for sale, and plaintiff relied upon that misrepresentation. Because defendant voluntarily agreed his interest in the Diner was a marital asset subject to equitable distribution, see Rothman, 65 N.J. at 228-29, and voluntarily agreed plaintiff was entitled to half of the proceeds that defendant recovered as a result of his ownership share of the Diner, the Family Part's award accurately reflects the parties' actual intent.

We reject defendant's argument that plaintiff had the greater obligation to investigate the value and status of the Diner before entering the PSA because she was represented by counsel, and he was self-represented. See Mims v. City of Gloucester, 479 N.J. Super. 1, 4 (App. Div. 2024) ("[A] self-represented litigant is held to the same standards of compliance with our [c]ourt [r]ules."). Defendant's self-representation does not excuse his misrepresentation of

material facts that plaintiff relied upon in entering the PSA and waiving her other, significant rights to support, specifically, that the Diner was already subject to a condemnation judgment when the parties signed the PSA, and the Diner was never listed for sale at $5.8 million dollars.

We affirm the trial court's decision finding plaintiff is entitled to half of the proceeds defendant received from his interest in Stavros, Inc.'s property. The trial court's decision to broadly construe the parties' PSA, specifically the use of the term "sale," to include the proceeds defendant received from the inverse condemnation settlement award properly reflects the parties' stated intentions--to share in the disposition of that interest equally. The inclusion of the $5.8 million sale price of the Diner in the PSA constitutes a "mistake" plaintiff relied upon and is "accompanied by concealment of the [defendant]," who was aware the property was subject to an eminent domain judgment and failed to inform plaintiff of the accurate status of the Diner. Miller, 160 N.J. at 419. Therefore, defendant's reliance on the use of the word "sale" to exclude funds emanating from the inverse condemnation action is duplicitous, and "fails to express the real intent of the parties." Ibid.

Moreover, defendant would receive an inequitable windfall not intended by the parties in their PSA if he were allowed to retain all of the proceeds from

11

the inverse condemnation action. We note plaintiff could have challenged defendant's claim that his share of the condemnation proceeds was used to pay off a "loan" to his aunt, but she chose not to do so at the plenary hearing. We also note plaintiff did not appeal the trial court's denial of attorney's fees to her, despite defendant's demonstrated misrepresentations in the PSA.

To the extent we have not addressed any of defendant's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3084-22